Case number 18-5516, Arianna Williams v. City of Chattanooga, TN, et al. Oral argument, 15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Holland for the appellant. Good morning, Your Honors. Good morning. My name is Adam Holland of the Chattanooga, TN Bar, and I represent the appellant of reserved 5 minutes for rebuttal. You may. Thank you. Thank you, Your Honor. This is an excessive force case that was resolved under Rule 56 in the court below. And again, my client, Ms. Arianna Williams, has brought certain claims against the City of Chattanooga and the named defendant police officers on behalf of the minor child, JSC. And it is our contention and our theory of the case that when the named defendant or appellee officers engaged in the use of force against Mr. Eagle, the use of force which ended his life, it is our position that that force was unreasonable considering the totality of the circumstances of the case and certainly that that use of force was unconstitutional. You admit that there's no violation on the first volley of shots. That is correct, Your Honor. And this is a case where we have engaged in extensive discovery. And as we develop the case in discovery and in depositions, we determined that the first volley was justified under the facts of the situation. And that's where— Were there two shots the first time? Yes, Your Honor. We believe that there were two shots. There was Officer Johnston who was dismissed from the case and Officer McFarland who believes he also fired in the first volley. We know that Mr. Eagle, the decedent, was struck by at least one shot during the first volley. Okay. This is the ridiculous question. How many shots are in a volley? More than one. And we used both— My colleagues probably know guns, but I don't. I would say that if there's more than one shot fired, we would characterize it as a volley of fire. And we believe— How many times you pull a trigger for a volley? Yes, each. More than once. Correct, Your Honor. And there's no legal definition of that or not. I see. Gotcha. This is just a characterization of— This means a number. Yes, Your Honor. More than what? More than one. And in the first volley of fire, again, when that happened, that was when Sergeant Churchwell, one of the officers at the scene, was retrieving my client from—extricating my client from the scene. And when Mr. Eagle made a move toward the back of Sergeant Churchwell as he was fleeing the scene with my client, that's when Officer Johnston took a shot. And we believe Officer McFarland also fired. And that was when Javario was struck. He went up on his toes, fell forward, dropped the pistol. And then that's when we get into the 10-second lapse of time between this first volley and the second volley. Now, in the second— Do you know that any of these shots fired the first volley were fatal? I mean, we didn't kill him right then, but were they fatal shots like to the head or to the heart? No, Your Honor. It was a shot we believe that struck somewhere in his torso, but there has not— Your Honor, it's our position that the first shots were not fatal and would not have been fatal. It was the subsequent second volley of fire when Mr. Eagle was struck by between another five and six rounds. Those were the ones that we've determined, and again, based upon the coroner's report that's in the record, those were the shots that were fatal, ultimately fatal to Mr. Eagle. When Mr. Eagle dropped the pistol, what do you contend where the pistol was at that point? Our position on that, based upon, again, the evidence and the record, which includes a bystander cell phone video, when that bystander cell phone video is reviewed, obviously it's not— It had to be reviewed frame by frame because it's so unhelpful to the court. What we saw. You have to slow it down. Is that all the evidence you've got is the video? The video, the bystander's testimony, Mr. Dedrick Suttles, he did put in an affidavit as to what he saw. We have the testimony of the officers at the scene. We have, when we look to the number of rounds that were fired, and again, when we focus the court's attention on the second volley, where the rounds were actually striking, we had rounds striking the ground. It was Officer Griffith who testified at his deposition that he had to jump out of the way or he would have been hit. We had rounds striking. I thought the question was about where the pistol— Go back to the pistol. I'm sorry, I didn't mean to— Sorry I got you off on a tangent. That's okay. Well, we do know that Mr. Eagle dropped the pistol when he was shot in the first volley. We know that from the testimony? There's eyewitness testimony. The question, of course, the court has is what's that mean? Where did it land? Right. It was either near or underneath him. That's what we have determined, and when you look at the bystander cell phone video, admittedly it's grainy, it's hard to follow, but when you do slow it down, there are certain frames of that video that Mr. Eagle has observed, raising his head, moving his arms forward, and then he's shot. Now, when we go back to what the— Raising his forearms, but it said he's—I can't tell what that meant. It said with his arms forward. Are they on the ground? Is he prone? He's still on the ground. Again, you have to look at each one of these. I understand, and you've done that. We haven't. And you go back, and you'll see him. He's kind of on his side in somewhat of a fetal position. And then, of course, again, the video is moving around, and you slow it down, and then it goes back, and you see him looking forward, and you actually can see his head. You can see him looking up, and his arms are in front of him, almost like he's in a push-up position, and then they move forward, and then the shots are fired. But we know he's got the pistol there. The pistol would be near him or underneath him. That is correct. But he still has it. It's not in his hand from my viewing of the video, and the court below even concluded that a reasonable juror could find that Mr. Eagle was not holding the pistol, raising the pistol, or getting up with the pistol, because when you go back to the officer's initial statements that they gave after the incident, the officers were testifying that Mr. Eagle was getting up with the pistol and drawing the pistol on Officer Griffith, and that's why they justified the second volley. However, the video contradicts that. So, too, does the eyewitness account of Diedrich Suttles, a gentleman that was holding the cell phone, and that inherently is an open fact. The court had to read it in the light most favorable? Yes, Your Honor. Right. And since we're here on the most favorable light, what do you say? Since we're here on Rule 56 and looking at the evidence in the most favorable light of the non-moving party, I think the key question here for purposes of Rule 56 with regards to whether or not these officers enjoy qualified immunity is to whether or not their belief, and, again, we have to presume that it's a mistaken belief with regards to whether or not Mr. Eagle was getting back up with the pistol. Well, he did not have it in his hands. We presume that he didn't. We presume that he wasn't reaching for it. So the officer's mistaking belief that he was, the question is, was that reasonable? And could the trier of fact find that it was unreasonable for the officers to think that? Because if a reasonable jury could conclude that the officer's mistaken belief was unreasonable, and, again, we go back to the Garner case and the cases that have followed in the years since Garner, a mistaken belief, if unreasonable, does not allow the officers qualified immunity. That can't overcome qualified immunity. And that's the inherent fact question. And, again, when you go back to the totality of everything that was going on here. Do we know that all these officers that are being sued here fired a weapon and that bullet hit the decedent? Do we know that? All of the officers that are named fired their weapons. Now, whether or not each individual officer struck Mr. Eagle, I do believe that's an open fact question. What if the shot wasn't a very good shot and went over his head? Is that a civil rights violation, do you think? Well, Your Honor, if the force was excessive and Mr. Eagle was fired upon, certainly I still believe that that could rise to a civil rights violation. However, when we get to the question of damages, if any of the individual officers could establish that their rounds did not strike Mr. Eagle, certainly that would be a defense that the individual officer could raise at trial, and that would necessarily go to the trial of fact. We're not there yet. We're still here under Rule 56. We do know Mr. Eagle was struck in the second volley by somewhere around six or seven rounds as he lay on the ground. Are all the rounds the same caliber? No, Your Honor. There were, I believe, three of the responding officers had AR-15 platform style assault rifles, and then two of the other responding officers had their sidearms, their pistols. And I do believe the coroner's report indicated that both types of rounds had struck Mr. Eagle. And when we go back again, when we look at the reasonableness of what the officers believed or perceived, the analysis is that the court has to look at each individual officer and what each individual officer perceived at the decision to use force and whether or not that was reasonable based upon the facts and circumstances of the case. Again, our position is that it's an inherent fact question. And I say this respectfully to the court below, but I do believe that the trial court improperly weighed the evidence here and got into making certain determinations based on the evidence and witness credibility determinations. The trial judge even developed his own theory of the case of what Javario could or maybe was doing at that time. And respectfully, again, to the court below, that's not the court's function at the summary judgment stage. And, again, we believe there are tribal issues here, and this case should be remanded for trial. I see my time has expired. I'll save the rest for rebuttal. Thank you. May it please the Court, my name is Janie Varnell of the Hamilton County Tennessee Bar. I'm here to argue on behalf of the individual officers in this case for seven and a half minutes. My colleague, City Attorney Phil Noblitt, will argue for the latter half of my time, of our time, on behalf of the City of Chattanooga. This court should affirm the district court's grant of summary judgment because they did not, the officers did not violate a clearly established right. Their actions were objectively reasonable, considering the totality of the circumstances, and they are entitled to qualified immunity. The district court in this case rendered a... Stop there, because does it, maybe this is right. I think it might narrow to whether the firing of the shot can be viewed, or it was objectively unreasonable. The firing of the second shot. I mean, if we take it, gel it down to the last, most succinct issue, it's whether or not the second shooting was objectively unreasonable, would be so viewed. That is correct. By a juror. That means, say we surmount the other hurdle, that one has to be surrounded by the plaintiff here. Yes, yes, you are correct in that. I think in order to lead up to that issue, I think there needs to be a discussion and a recognition of the totality of the circumstances in this case. While it is a totality of the circumstances analysis, and we should focus on the seconds immediately preceding the second volley of shots, we also need to focus on those facts that form a basis of an officer's conduct, a decision that he makes to use deadly force, and that includes the facts that happened prior to the first volley, and I can explain why. Before the first volley, we have an intense standoff between these officers and Javario Eagle for over 15 minutes. Over 40 commands to drop the weapon were given to Mr. Eagle, and as the district court correctly found, Mr. Eagle would routinely drop the weapon, an officer would leave his cover position, and then he would pick it back up again. This happened multiple times, as can be seen in the record, and the court found that. Then when we have a situation where Eagle goes back into the apartment for the final time and his daughter is left in the courtyard, Sergeant Churchwell then, again, leaves cover, goes to grab her, turns his back on him coming out of the apartment holding a gun, and runs safely to get the small child to safety. That gives him justification for the first volley. Does it also give him justification for the second volley? I think the court can look to Mr. Eagle's pattern of behavior when it comes to deciding the reasonableness of these officers and their decision to use deadly force on the second volley. All those officers, were they present at the time that the scene was bringing this daughter out and picking up the gun and all that stuff? I believe the testimony by the officers was by the time the first shot was fired, every officer was on scene. They may not have seen Mr. Eagle running back and raising the weapon, but they were present for the first volley of shots. Then after the first volley of shots, Mr. Eagle goes down to a fetal position. During the 10 seconds of time that this plaintiff would have this court hold that Mr. Eagle ceased to pose a threat, we would say that the district court was correct. Did your clients testify to the effect that he was no longer a threat after the first round? It seems like I saw something like that on the record. I don't believe that to be the case here, respectfully, Judge. I believe they testified that once he fell to the ground, he either dropped the pistol, some even thought that he still had it on him, and as the district court found, taking the lie most favorable to the plaintiff, the gun fell underneath him or near him. Is it your client's position that could Mr. Eagle have made any movement? Would that have given your client justification to shoot him? Was he supposed to stay motionless? I'm trying to understand what he exactly did that makes the argument that no juror could say that it's unreasonable for the police officers to shoot him. Sure. I think when determining whether this was reasonable, what we have here was a ten-second interval of time. And if you listen to Officer Cobb's in-car camera footage, the first volley of shots happens at 12.06 and zero seconds. At 12.06 and seven seconds, we start to hear yelling on the video. And this yelling starts at seven seconds and then gets louder and louder and louder for the next three seconds until the second volley of shots. During that ten seconds, which officer? Is it the same officer who fetched the child that goes and approaches the decedent? No, Your Honor, it is Officer Griffith. Okay. And so during the ten seconds, he has taken steps toward the decedent? He is moving towards the decedent, left his cover. So how many seconds does that take up? I believe— Of the ten. We still have action going on within the ten, right? Is that within the ten? Yes. So, Officer Griffith, I don't know at what point after 12 minutes or 12.06 and zero seconds that Officer Griffith starts to move, but I know that once the second volley of shots goes off, he is within six feet of Mr. Eagle. So he's begun to move, we can tell. He has. Right. And so what we— What was his goal? Did they testify what his purpose was? His purpose was to secure the weapon because once the—and circling back to Judge Bush's question— Is he yelling? Are they telling him, don't move? It's hard— What are they saying to him? It's hard to make out what the yelling is because Officer Cobb, it's his microphone that's picking up everything, and he's yelling, get the gun, get the gun, get the gun. Is there any testimony that any officer told Mr. Eagle, don't move? Not that I can recall. Okay. No, sir. I think— Anything to that effect? I think the testimony was, don't do it. Somebody said, don't do it. Somebody said, drop the gun. Somebody testified to saying, he's got the gun. They were—from the perceptions of these officers, he was either making a move to get the gun, he already had it, and he was raising it. This dramatic movement that these officers saw formed the basis of their split-second decision to fire in the second volley. And respectfully, that is exactly the type of decision that qualified immunity protects. All this time, the decedent was on the ground that they were making that? He was on the ground in the fetal position after the first volley, and sometime immediately prior to the second volley of shots, he does a dramatic, sudden movement going from a fetal position to essentially on his stomach with his arms stretched out forward. That's what I mean. Was he doing a push-up or not? Counsel thinks it's a push-up, which would have him elevated in a sense to get the gun. I don't— Or is he stretching out to surrender? I wouldn't say he was stretching out to surrender, and I think that the case law is clear. It must be a clear measure of surrender. I think Rush v. City of Lansing holds that. But I think that this dramatic movement can't be understated because he literally goes from a fetal position to on his stomach and shoots his arms forward and directly in facing an officer that's within six feet of him. And when you go back to the pattern of conduct of Mr. Eagle before, this drawing of an officer out of cover and then grabbing the gun again, we think that— We have your point. Thank you. Thank you. May it please the Court, I'm Phil Knoblett of the Chattanooga Bar. I'm the Chattanooga City Attorney at this point in time. I represent the City of Chattanooga, and I'm also the attorney for three of the individual officers in connection with this case, Officers Mitchell Moss, Chris Palmer, and Jacques Wehry. There were some questions originally as to what people saw when they got there. This incident was going on for about 15 minutes. Officer Moss and Officer Wehry were in different locations. They were there early on the scene, and they were observing the actions of Javario Eagle that day. Mr. Eagle actually called and dispatched the police to this location, was making incoherent statements. The officers have all testified in their statements about crazy statements he was making there at the scene. Did the district court have looked at all these individually and decided qualified immunity for some and not qualified immunity for the others? I think they could have done that. The aspect in connection with this case, because it was such a fast, rapidly moving situation between the first volley, which the court clearly found to be a proper use of deadly force, and the second volley is these officers trying to assess and evaluate as they're moving forward to try to secure that gun that this fellow still had in his possession. There's no dispute at all that this fellow was incapacitated to the point where he could not use that weapon to hurt other officers, and that is something that police officers have to be careful about  The threat was still there in the possession of Mr. Eagle at that point in time. The court determined in connection with this that none of the actions that were showing on any of the video evidence in this case established that that gun just went flopping somewhere else in connection with this matter and it was not available for him to be able to use. So that was the basis for the determination of whether these officers were acting objectively reasonable or not based upon the totality of the circumstances. How far were they from the decedent when he was shot the second time? Well, you've got different officers coming from different directions. All of these officers are having to independently determine Officer Weary was in one direction over to the right, Officer Griffith here was closest to them, and in fact, Officer Moss was trying to proceed forward as well as Officer Palmer at that point in time. Officer Moss ended up having to shoot a .45 in three directions off the side because he was so close to the location of Officer Griffith at that point in time, and they were concerned because they perceived a threat coming in their direction. There's no question from the officer's testimony that they perceived a threat at the time they fired their guns in the second volley. As you're aware, the decedent's argument is, or his survivors say, why didn't you just leave him alone? You taunted him. He got fearful. The argument was, hey, you should have not approached him. What about that argument? I know that the officers make the argument you could have let him bleed to death. And that would be an argument of a violation under Section 1983 that we had failed to render aid to someone who was in bad condition. We tried to make sure at least if someone has been hurt or if they are still a threat because this is occurring in the courtyard of the Woodlawn Homes location in Chattanooga. Mr. Eagle had called people to that location. There are numerous people that are still in this area. The child has been removed at this point in time. There are cousins, and there is Mr. Dedrick. I forget Dedrick's last name here, the fellow that was taking the video in part, who is off in the distance as well. And you have to be careful about whether that gun would be used as to others. So that was something that these officers were having to deal with at the time this incident occurred. They actually rendered aid whenever they got to him. They actually provided him medical treatment there at the scene, and then he was taken on to the hospital whenever he succumbed. Were these officers in the second body as close as you are to me? Were they more like back of the room? Mr. Griffith, I think, was closer than you and I are at this point in time. He was within six feet, according to the testimony. How tall are you? I guess I'm right now probably about 10 or 15 feet, so it was closer than that distance on there. Very close, yes. And the other officers were behind them, moving forward, trying to secure the weapon at that point in time. And we had a couple officers. There was some question about the types of weapons used in here. They had a couple of officers. Officer Weary and Officer Moss were using .45 pistols. Officer Palmer had a .223 assault rifle at that point in time that was moving forward in this process. There is testimony in the opinion quite heavily between page 14 and 20 of the district court opinion that talks about how the officers were doing and reviewing whether there was some type of reasonable force utilized by all of these officers in connection with this case. I do think it's real important that you look at the timing, and we dealt with this quite heavily with the video evidence that was involved in this case. Johnson and McFarland get on scene about 12.06, and they had actually fired because he was approaching Officer Churchwell as he was trying to retrieve the child from a situation where the child had actually been held up with a gun very close to her in connection with this. The video established that at the time. That's in the first volley, right? Yes, sir, in the first volley. That occurs at 12.06 on the dot. And the incident of the second volley occurs at 12.06.10 as the officers are trying to move up after the first shot occurred at that point in time. Counsel, I want to ask you about a case. Yes, sir. It's an unpublished decision from our court, so it's not, I guess, technically binding in the sense of being a published case. But the Margison case. Yes, sir. Have you looked at the Margison case? I have not, sir. Okay. I was just wondering how you would distinguish that case from this one. Well, the issue I have looked at in most of the case law I've reviewed is the aspect of whether there is a threat or a potential threat of someone.  or the ability to retrieve a weapon or be some sort of danger to the police officers. The concern in this case is that the officers all perceive that, as did the court. Is the determining factor the fact that there was a gun by the decedent, or before he was a decedent, he had a gun in his vicinity? Is that the determining factor here, why the officers get qualified immunity? I believe that the fact that that gun was accessible, that it was available, the officer's testimony was available. But also there was movement. I take it as a combination. There's some movement by the now shot victim. There's some movement with the argument that nobody knows that the gun has been removed, arguably. That's the problem, huh? So the rule for future cases, if we were to adopt your theory, would be any time someone has a gun in their vicinity and there's any movement after they've been shot, there will be qualified immunity. Clearly the officers were trying to tell this person to drop the gun, not do that at that point in time. They were disregarding the officer's orders. I don't know what else the officer's ability is under those circumstances. I'm just having trouble not seeing that as a jury question. You're trying to make it a bright line rule. I think I'm trying to deal with the aspect of it being the totality of the circumstances on what they had observed, as did the judge in this case. And he had observed Mr. Eagle do similar activity earlier in the day. That was part of his ruling. The fact that these officers were there and observing this guy, basically when he's told to drop the gun, he'll flip it out there, and the officer starts trying to come up to the scene, and then he runs and grabs the gun. He wasn't shot, obviously. He was not shot under those circumstances. But the concern of these officers after the van was charging towards another officer and the child at that point in time when the first volley went off, his ability to be able to use that weapon is there available to them. So that was the concern of our officers, at least at that point in time. Now the concern of the court, and you all had a bunch of, I guess, expert proof submitted in the record in this case, was that basically there were all sorts of things that potentially could be an issue for the city's liability and the officers. To be fair, your time has expired. Oh, my. Yes, ma'am. It only just did. Yes, ma'am. Let's make sure that we stick by it. Thank you. Thank you. And in rebuttal, Your Honor, and to clarify what we were discussing earlier, when you go back and you look at the video, he goes from the fetal position, moves over to that push-up position, then he moves his arms forward as he's getting shot. If he had a pistol in his hand at that moment and they could see it, they were justified in the second volley, right? Potentially, if he were raising a pistol. If he didn't drop it. Right. But there was testimony from some of the officers that he dropped the pistol. There was testimony that the pistol was observed hitting the ground and bouncing. I mean, that's all in the record. And then, again, when you look at the bystander cell phone video, you don't see him raising up with a pistol. And when you compare what the video shows to what the officers initially testified was the basis of their justification for shooting him, there is a contradiction. The qualified immunity doesn't require that they be correct. Yes, Your Honor. That is correct. It's under the totality of the circumstances. Right. And the gun cannot be said to be inaccessible to the decedent, right? I mean, we all agree that the evidence has not eliminated the opportunity to get the gun again. That is correct. But, again, I think when you go back to the factual analysis and looking at if the officer's belief was mistaken, was that mistaken belief reasonable? Reasonable, right. And they were in an open courtyard in the middle of the day. The sun was out. This wasn't in a darkened alley. This was in an open courtyard. And when you look at the fire response, when you look at how many rounds were fired, where those rounds struck, again, that's indicative of a reckless response. This was not coordinated. You had officers that were—Officer Griffith was in the line of fire of his own officers. It wasn't from Mr. Eagle shooting at him. It was from his own officers. Officer Griffith testified that rounds struck near his feet, and he had to jump out of the way. And we had rounds that struck the back part of the apartment. I think there was a door or a window frame that had a bullet lodged in it. Well, if you have officers trying to shoot a man on the ground, clearly they're not lined up, they're a lot of sights off, or they're not aiming at him. There's a discharge. I think when you look at the totality of the circumstances, this is one that should be decided by a jury. It should go to a jury. In resolution of this case under Rule 56— A jury would decide that it was unreasonable for anyone to fire at this individual at that time where the gun was not secured and officers are within—surely within shooting distance nearby. Right. And the public. Yes, Your Honor. A reasonable jury could conclude that Mr. Eagle, at the time he was shot in the second volley— Unreasonable. Yes, that it was unreasonable to shoot him because he was not raising up with the pistol, holding the pistol or otherwise brandishing it or threatening others with it. We know it was a pistol, right? Yes. There's some question about whether it was operable. Yes. They tried to shuck it out. Right. And the way that developed in the discovery, Officer Cobb was the first officer on the scene, and I believe it was Sergeant Churchwell might have been the next officer on the scene. But Officer Cobb radioed, you know, when they first encountered Mr. Eagle with the pistol, the pistol was jammed, and Officer Cobb said, the pistol's jammed, he's trying to clear it. And then this is when we went with Mr. Eagle. Of course, he was talking and behaving erratically. He was going back in and out of the apartment, putting the pistol down, picking it back up. And then this all culminated in the shots that were fired in the first volley. In the ten seconds, he's on the ground, second volley is fired, and when the weapon was recovered at the scene, it was still jammed, and the slide was locked back in open, in the open position. He had some kind of a sword, too, didn't he? He did. He had a samurai sword that he had at one point tucked under his arm that he had dropped, but the record did not show that he was running at the officers with a samurai sword or, you know, again, this was not. Well, it's not in the program. We only needed what's worrisome is right there during the ten seconds. Right. That's where we are. Yes, Your Honor, that's where we are. And that's where I think ultimately this has to be decided, and it's our position, again, that it is a jury question. And this case should be remanded back to a jury for trial on all issues on the merits. We've done a nice job for your client. Thank you, counsel. Thank you, Your Honor. As has the government. We will study the matter carefully. You'll see an opinion in due course. Thank you. And with that, we will be able to adjourn.